**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| William Mills, | No. CV-19-04837-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Finish Line Incorporated, | |
| Defendant. | |

At issue is Defendant The Finish Line, Inc.'s Motion for Summary Judgment (Doc. 43, Def.'s MSJ), to which Plaintiff William Mills filed a Response (Doc. 49, Pl.'s Resp.) and Defendant filed a Reply (Doc. 50, Def.'s Reply). The Court finds this matter appropriate for decision without oral argument. *See* LRCiv 7.2(f). For the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's Employment Discrimination claims.

**I.    BACKGROUND**

The following facts are undisputed unless otherwise indicated. On November 21, 2010, The Finish Line, Inc. ("TFL") hired Plaintiff William Mills, a Black man, as a seasonal part-time Sales Associate at the Superstition Springs Store ("Store 316"). (Doc. 44, Defendant's Statement of Facts ("DSOF") ¶¶ 3, 5.) On or around May 25, 2012, TFL promoted Plaintiff to full-time Assistant Store Manager ("ASM") at Store 316, where he reported to Store Managers Chris Brown, who is White, and Donielle Brown, who is Black. (DSOF ¶ 5.)

On or around March 11, 2013, TFL hired Kristin Bond, who is White, as District Manager to oversee stores in Plaintiff's District. (DSOF ¶ 9.). Ms. Bond was responsible for the hiring and promotion of management employees, including Managers-in-Training ("MIT"), Managers-in-Waiting ("MIW"), and Store Managers. (DSOF ¶ 11.)[1] From 2013-2016, Ms. Bond hired multiple candidates, both White and non-White, for Store Manager. (DSOF ¶ 16.) However, through the accelerated training program ("fast-track"), she hired 6 candidates, all White, including Ashley Marcinko, Jason Guadagno, and Nicole Sacco.[2] (Plaintiff's Separate Statement of Facts ("PSSOF") ¶ 104.) Ms. Bond had previously supervised Mr. Guadagno and Ms. Sacco at Sunglass Hut, where each held managerial positions. (DSOF ¶¶ 77-78.)

Shortly after TFL hired Ms. Bond, Plaintiff emailed her expressing interest in the MIT position for the Desert Sky Store ("Store 313"). Ms. Bond subsequently started observing and communicating with two Store Managers about Plaintiff's performance as ASM. (DSOF ¶ 25.) While Plaintiff contends that Ms. Bond did not report any negative feedback from the Store Managers, Defendant contends that Plaintiff struggled with management skills. (DSOF ¶ 26; Bond Decl. ¶ 24; PSSOF ¶ 25.)

In May 2013, Ms. Bond discussed with Store Manager Trainer Julia Cruz that managers should recruit employees who demonstrate positive energy as well as an interest in sports and athletic apparel. (DSOF ¶ 19; Declaration of Julia Cruz ¶ 12; Declaration of Kristin Bond ¶ 20.) On May 24, 2013, Store Manager Trainer Julia Cruz sent an email to managers regarding the TFL hiring guidelines. The email stated in part:

> When we do the 2nd 'interview' it's after you have determined the interview went fantastic and you WANT them on your team. They have to look the part

---

[1] MITs are responsible for managing the store, assisting the Store Manager, and training to become Store Manager. (DSOF ¶ 12.) MIWs are senior to MITs, have completed most or all of their training, and are ready or near ready for promotion to Store Manager. (DSOF ¶ 13.) Store Managers are responsible for all aspects of store management and supervision of employees at the store. (DSOF ¶ 14.) Store Manager Trainers are senior to Store Managers. They train and coach other Store Managers and assist the District Manager with his or her duties. (DSOF ¶ 15.)

[2] Plaintiff identifies six White candidates that Bond promoted to Store Manager but only names Ms. Marcinko, Mr. Guadagno, and Ms. Sacco as candidates who wrongfully were promoted instead of him. (Declaration of William Mills ("Mills Decl.") ¶¶ 36-37.)

- 2 -

and then by phone make us feel they would be an asset to your team. We obviously can't see them over the phone so we trust your judgment with physical appearances. We can't have people that don't 'look' like they belong in our stores.

(DSOF ¶ 20; Cruz Decl. ¶ 12, Ex. 1.) Defendant contends that Ms. Cruz's email merely communicated the initiatives she discussed with Ms. Bond, while Plaintiff avers that he and other Black employees believed the word "look" was a reference to the candidate's race. (DSOF ¶¶ 20-22; Cruz Decl. ¶¶ 13-15; PSSOF ¶¶ 21-22.)

Additionally, Plaintiff contends that around this time, Mr. Brown informed him that Ms. Bond wanted him to cut his long hair. (PSOF ¶ 86.) Defendant disputes this contention and Ms. Bond denies making this statement. (DSOF ¶ 89.) Plaintiff ultimately did not cut his hair. (DSOF ¶ 88.)

On or around June 23, 2013, Ms. Bond promoted Plaintiff to MIT of Store 313 to give him the opportunity to improve his managerial skills. (DSOF ¶ 27.) Plaintiff reported directly to Ms. Bond and was supervised by Dylan Peace. (DSOF ¶ 29.) Both parties agree that Plaintiff received on-the-job training for the Store Manager position and that Ms. Bond worked with him on leadership as well as coaching and holding his employees accountable. (DSOF ¶¶ 31-32; Bond Decl. ¶¶ 27-28, Exs. 8-9.) Defendant further contends that on several occasions, Ms. Bond encouraged Plaintiff to accompany her on Store Visits to learn from her observations and review of Store Managers, but he never accepted her offers. (DSOF ¶ 35.) Plaintiff claims that Ms. Bond offered the shadowing opportunity once and that the only training she provided him was through email and suggesting online training management modules. (PSSOF ¶¶ 17, 35.)

On or around January 11, 2015, Ms. Bond promoted Plaintiff to Acting Store Manager of Store 316 while the full-time Store Manager was on maternity leave. (DSOF ¶¶ 37, 40.) She selected Plaintiff for this position to give him the opportunity to work on his leadership skills, gain first-hand experience as a Store Manager and because he previously had worked at Store 316. (DSOF ¶ 39.) After six weeks, Ms. Bond conducted a Store Visit at Store 316 and observed significant deficiencies in Mr. Mills's performance.

1 (DSOF ¶¶ 44-46.) She reported that there was low energy in the store, which negatively
2 impacted conversion of sales and that the team members at Store 316 were not following
3 the TFL processes and guidelines. (DSOF ¶¶ 46-47.)

4 Following the Store Visit, Ms. Bond informed Plaintiff that his lack of leadership
5 was significantly hindering the store, causing it to fall short of sales goals and underperform
6 compared to the District, Region, and Company as a whole:

> Will… There are inconsistencies with results being delivered and inconsistencies in supporting the company initiatives. You have an opportunity to improve and gain consistency here – this coaching, developing and driving your team to support the company initiatives while driving for results. As we review the overall KPI's, majority are not beating the District, Region or Company.
>
> Will your continued lack of leadership and unwillingness to make changes is hurting the performance of the store. Will, you are failing to fulfill managerial responsibilities, failing to improve the customers experience and is reflected in the KPI's – Conversion has decreased and Sof Sole Results below District Region and Company. If you fail to comply with the directives outlined in the visit or fail to show marked improvement it will result in further disciplinary action including termination. Consistent improvement is expected as a condition of ongoing employment.

17 (DSOF ¶ 51.) Plaintiff disputes the accuracy of Ms. Bond's report, contending that
18 Ms. Bond could not properly evaluate him in six weeks and that although Store 316 was
19 "notoriously difficult," he outperformed the company-wide and District store average in
20 certain key metrics. (PSOF ¶¶ 46, 49.)

21 When Plaintiff's Acting Store Manager assignment ended on or around April 5,
22 2015, Ms. Bond subsequently transitioned Plaintiff to MIW, which is a more senior
23 position than MIT. (DSOF ¶¶ 53-54; PSSOF ¶¶ 53-54.) Plaintiff began his new MIW
24 position at Store 316 but shortly thereafter transferred to Store 313, where he again reported
25 to Store Manager Donielle Brown. (DSOF ¶ 55.) During a subsequent Store Visit at Store
26 313, Ms. Bond revisited the issues she observed with Plaintiff's performance during his
27 Acting Store Manager assignment. (DSOF ¶ 56.) She informed Plaintiff that he needed to
28 further improve in the areas of leadership and coaching his direct reports, delegating tasks

more effectively, and efficiently using his time but did not provide the feedback in writing. (DSOF ¶ 57; PSSOF ¶ 57.)

In late 2014 or early 2015, Plaintiff began looking for other employment. (DSOF ¶ 59.) In or around April 2015, Plaintiff applied to a position with State Farm and subsequently accepted an offer. (DSOF ¶ 60.) The parties contest whether Plaintiff properly gave two weeks' notice or submitted his resignation, but agree that Plaintiff worked his last shift on May 8, 2015 and started work at State Farm on or around May 10, 2015. (DSOF ¶ 62.) On June 5, 2015, a Resignation Separation notice was submitted on behalf of Plaintiff, and his employment was terminated. (DSOF ¶ 69.)

## II.     LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, a moving party is granted summary judgment when: (1) the movant shows that there is no genuine dispute as to any material fact; and (2) after viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" of material fact arises only when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, the court must regard as true the non-moving party's evidence, if it is supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. However, the non-moving party may not merely rest on its pleadings; it must produce some significant probative evidence tending to contradict the moving party's allegations, thereby creating a material question of fact. *Anderson*, 477 U.S. at 256-57 (holding that the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

"A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d 1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

## III. ANALYSIS

### A. Plaintiff's Title VII and Section 1981 Disparate Treatment Claims of Discrimination Based on Race

Defendant moves for summary judgement on Plaintiff's Complaint. Plaintiff alleges disparate treatment based on race under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The standards for a prima face discrimination claim are the same under § 1981 and Title VII. *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

#### 1. Title VII Race Discrimination Legal Standard

Under Title VII, it is illegal for an employer "to discriminate against any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a). The Supreme Court's landmark employment discrimination case, *McDonnell Douglas Corp. v. Green*, sets forth the burden-shifting scheme that courts use to analyze Title VII claims. 411 U.S. at 802. Under *McDonnell Douglas*, the plaintiff must first establish a *prima facie* case for employment discrimination. *Id.* To do so, the plaintiff must show that "(1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subjected to an adverse employment action, and (4) similarly situated [] individuals [of another race] were treated more favorably." *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658 (9th Cir. 2002) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

By establishing a *prima facie* case under the *McDonnell Douglas* framework, the plaintiff "creates the presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race." *Cornwell,* 439 F.3d at 1028 (citing

*McDonnell Douglas*, 411 U.S. at 802). If the plaintiff is successful in establishing a *prima facie* case, the burden shifts to the defendant to articulate some "legitimate, nondiscriminatory" reason for the plaintiff's termination. *McDonnell Douglas*, 411 U.S. at 802. If the defendant articulates such a reason, the burden then shifts back to the plaintiff to prove that the defendant's proffered reason was merely a pretext for unlawful discrimination. *See Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

### 2. Plaintiff Has Established a *Prima Facie* Case

Plaintiff produced sufficient evidence to create an issue of material fact as to whether he can show a *prima facie* case of discrimination. Defendant asserts that Plaintiff: (1) cannot show that he was qualified for the position of Store Manager or that he was performing his job satisfactorily, and (2) cannot show that TFL treated other similarly situated non-Black employees more favorably. (Def.'s MSJ at 2.) The Court disagrees. While his promotions to MIT, Acting Manager, and then MIW do not guarantee him a Store Manager position, they are evidence that Plaintiff was strongly considered and thus qualified for purposes of meeting the low evidentiary bar required to prove his *prima facie* case. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (explaining "the requisite degree of proof necessary to establish a prima facie case for Title VII… on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence.") Moreover, Plaintiff disputes Defendant's subjective evaluation of his managerial capabilities and produced evidence that he received "Achieves" or "Exceeds" in all performance reviews prior to Bond's arrival. (PSOF ¶ 26.)

Based on similar reasoning and evidence, Plaintiff proffered sufficient evidence that he was similarly situated to the external candidates TFL hired as Store Managers. Defendant argues that Mr. Guadagno and Ms. Marcinko's extensive managerial experience and known leadership abilities differentiate them from Plaintiff. However, this discounts Plaintiff's experience in the MIT and MIW programs as well as his stint as Acting Manager at TFL. While not identical experiences, Mr. Mills had sufficient managerial experience to create an issue of fact whether he was similarly situated to the external candidates.

### 3. Defendant Has Articulated Some Legitimate, Nondiscriminatory Reason

The burden of production then moves to Defendant to articulate some legitimate, nondiscriminatory reason for the challenged action. *Villiarimo*, 281 F.3d at 1062. Defendant produced evidence that Ms. Bond did not promote Plaintiff to Store Manager because he failed to demonstrate leadership or fulfill certain managerial responsibilities as MIT and Acting Store Manager, which resulted in declining sales numbers and failure to meet key metrics. Specifically, Ms. Bond found that Mr. Mills did not hold his employees accountable and that on multiple occasions his employees did not understand store initiatives. Importantly, some of these issues spanned from his time as an MIT through his promotion to Acting Manager and subsequent placement as an MIW. Ms. Bond provided this feedback in detailed emails, conversations, and a performance report. (Bond Decl. ¶¶ 27-28, 36-37, Exs. 8-9, 11.) Additionally, Mr. Guadagno and Ms. Marcinko had significant managerial experience. Both worked as store managers at Sunglass Hut and reported directly to Ms. Bond, where she witnessed firsthand their leadership capabilities. (DSOF ¶¶ 75-78; Bond Decl. ¶¶ 56-59.) This evidence illustrates that Defendant had legitimate, nondiscriminatory reasons for its decision to not promote Mr. Mills to Store Manager.

### 4. Plaintiff Has Not Established a Material Factual Dispute as to Whether Defendants' Reason Was Pretextual

The burden now shifts back to Plaintiff to show Defendant's articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang v. University of California Davis, Bd. Of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000). "Direct evidence is evidence, which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (internal citation and quotations omitted). Where direct evidence is unavailable, a plaintiff may provide circumstantial evidence to show that the defendant's explanation for the challenged action was mere pretext

for discrimination. "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

Here, Plaintiff has not proffered direct evidence of discrimination. Nor has he provided sufficient circumstantial evidence that Defendant's rationale for not promoting him was pretext for discrimination. Much of Plaintiff's evidence proffered to support his *prima facie* case is relevant to the pretext inquiry; however, it is insufficient to create an issue of material fact at this stage of the analysis. *See Hawn v. Exec. Jet Management, Inc.*, 615 F.3d 1151, 1158-59 (9th Cir. 2010) (explaining that the same evidence may be relevant to prove both his *prima facie* case and pretext, but plaintiff's evidentiary burden is "much less" at the *prima facie* stage).

Plaintiff asserts that Ms. Bond's use of subjective criteria, such as lack of store energy and deficient leadership skills, to evaluate him is evidence of pretext. (Pl.'s Resp. at 4-6, 11.) He also notes that Ms. Bond demoted Katrina Woods, a Black Store Manager, based on similar subjective criteria. However, while "[s]ubjective job criteria presents potential for serious abuse and should be viewed with much skepticism," *Nanty v. Barrows Co.*, 660 F.2d 1327, 1334 (9th Cir. 1981), it is not per se evidence of discrimination.

> We have explicitly rejected the idea that an employer's use of subjective employment criteria has a talismanic significance: 'Even assuming subjectivity was involved here, it has never been held that subjective evaluation by an employer is per se prohibited by Title VII, or alone shifts to the defendant the burden of proving absence of intentional bias....' Title VII is the law's promise that employment decisions will not be based on non-permissible discriminatory criteria, not that subjective criteria will be eliminated. [Plaintiff] cannot render sound business judgment illegal by labeling it subjective. Many criteria for higher level jobs are not easily articulable, and their conversion to writing does little to stop employers who desire to discriminate.

*Casillas v. United States Navy*, 735 F.2d 338, 345 (9th Cir. 1984). Therefore, the Court must look to the other evidence when determining the validity of Ms. Bond's subjective rationale for not promoting Mr. Mills. *See id.* at 345 ("[a]n employer's use of subjective

- 9 -

criteria is to be considered by the trial court with the other facts and circumstances of the case.").

The evidence proffered by both parties indicates that Ms. Bond's reasons were legitimate. Importantly, her decision to not promote Mr. Mills was also based on objective data showing underperformance in key metrics, which she consistently cited as a result of Plaintiff's failure to meet the subjective criteria. (DSOF ¶¶ 45-46; Bond Decl. ¶¶ 37-38.) These objective issues arose during Mr. Mills's time as an MIT and Acting Manager. Specifically, on May 7, 2014, Ms. Bond emailed Plaintiff, "I will challenge your team on a couple of areas… conversion continues to decline and Sof Sole sales are often not met." (DSOF ¶ 32; Bond Decl. ¶ 27, Ex. 8.) Mr. Mills himself acknowledged falling short of certain sales goals, writing to Ms. Bond on July 23, 2014, that he discussed with a co-worker "the 3 behaviors that we could focus on that would greatly improve our metrics," to which she replied Ok… you need to stick to this! You can't deviate from this plan! You must demonstrate your these [sic] behaviors as a management team and then you must hold your team accountable for the behavior." (DSOF ¶ 32; Bond Decl. ¶ 28, Ex. 9.) Finally, when providing Mr. Bond with feedback on the low energy of the store and his lack of leadership, Ms. Bond also wrote "[t]here are inconsistencies with results being delivered… as we review the overall KPI's, majority are not beating the District, Region or Company… conversion has decreased and Sof Sole Results below District, Region and Company." (DSOF ¶¶ 45-46; Bond Decl. ¶¶ 37-38, Ex. 11.) These communications illustrate that Ms. Bond's decision was based on factors other than subjective criteria and give credibility to her subjective observations.

Plaintiff attempts to explain away all issues by characterizing Store 316 as a "notoriously difficult" store. In fact, he contends that Ms. Bond assigning him to Store 316 is additional evidence of racial discrimination, stating he was "relegated to a notoriously difficult store for his 'one chance' at showing he could do the job, while white employees were handed better stores by Bond." (Pl. Resp. at 4.) However, Plaintiff fails to provide any supporting evidence for this conclusory assertion. *Taylor*, 880 F.2d at 1045. Mr. Mills

further contends that during his time as Acting Manager, Store 316 outperformed the company in several key metrics (PSOF ¶¶ 46, 106; Mills Decl. ¶ 27, Ex. 11.) However, he does not identify which metrics he improved. And importantly, even if he did improve certain metrics, it does not create an issue of material fact as to whether objective factors played a role in Bond's decision to not promote him. Plaintiff does not contend that Ms. Bond focused on the wrong objective metrics. His claim centers on her use of subjective, unverifiable criteria to justify not promoting him when the real reason was race discrimination. Ms. Bond's use of objective data discounts that theory regardless of whether Plaintiff performed well in other metrics. *See Green v. Maricopa County Cmty. Coll. Sch. Dist.*, 265 F. Supp. 2d 1110, 1128 (D. Ariz. 2003) ("[t]he focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.") (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)).

Plaintiff additionally contends that Ms. Bond only hired six managers, who were all White. This contention is belied by Defendant's evidence that she hired four non-White candidates for Store Manager, including Shaunteill Stapleton, who is Black. (DSOF ¶ 16.) Plaintiff points out that none of the non-White Store Managers are named in the documents Defendant provided to the EEOC. But these documents only list a subset of the Store Managers hired by Ms. Bond.[3] Because Plaintiff does not offer controverting evidence to dispute Ms. Bond's hiring of non-White Store Managers, the Court will credit Defendant's evidence.

Likewise, Plaintiff fails to produce evidence that he was more qualified for the Store Manager position than Mr. Guadagno and Ms. Marcinko or provide a different reason that he should have been promoted before them. Rather, Plaintiff focuses on the fact that he was in the MIT program but does not illustrate that this qualified him for, much less guaranteed him, a promotion to Store Manager. (Pl.'s Resp. at 6.) *Bradley v. Harcourt,*

---

[3] TFL's email to the EEOC responded to a question specifically about the hiring of the six White Store Managers. (Declaration of Joshua W. Carden ("Carden Decl.") ¶ 5, Ex. B.) And Exhibits C and D only list Finish Line employees who were actively seeking promotions. (Carden Decl. ¶¶ 6-7, Exs. C, D.)

- 11 -

*Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("An employee's subjective personal judgments of [his] own competence alone do not raise a genuine issue of material fact"). Moreover, while Plaintiff fails to provide an exact timeline, it appears that Plaintiff had been in the MIT program for only a year or less when each were hired. This experience does not compare well to either candidate, who had years of managerial experience at Sunglass Hut and Polo Ralph Lauren. (Bond Decl. ¶¶ 56-58.) *See Surrell*, 518 F.3d at 1106-07 (explaining candidate's management experience "significantly distinguish[ed]" her from plaintiff as most qualified candidate for management role).[4]

Ms. Cruz's email is similarly insufficient to create an issue of fact regarding pretext because it does not illustrate that TFL had discriminatory hiring policies. While Mr. Mills contends that he spoke with other Black employees who all believed that the email referred to race and that the email "disappeared" from everyone's computers, he does not provide evidence to support these assertions other than his Declaration. (Mills Decl. ¶ 34.) The Court must grant all inferences in favor of the plaintiff at summary judgment; however, it need not draw inferences where they are not supported by "specific facts," *Anderson*, 477 U.S. at 249. Here, Ms. Cruz produced her own Declaration explaining that the word "look" did not refer to race but rather to candidates who appeared "positive, enthusiastic, and interested in athletic shoes and apparel." (Declaration of Julia Cruz ¶ 14.) And after Ms. Cruz sent the email, Ms. Bond hired multiple non-White Store Managers and promoted Mr. Mills to MIT, Acting Manager, and then MIW. Moreover, TFL hired multiple other Black Store Managers prior to Ms. Bond's arrival, including Donielle Brown, Dylan Peace, Brittany Walls, and Katrina Wood. (Mills Decl. ¶¶ 3-4.) Plaintiff argues, and the Court agrees, that this evidence should not be considered when determining Ms. Bond's motives. But where Plaintiff offers Ms. Cruz's email to show that "TFL had a practice of giving white employees a preference for promotion," the previous hiring of Black candidates is

---

[4] Plaintiff does produce evidence that prior to his promotion to Store Manager, Mr. Guadagno was arrested for stealing money from TFL in 2013. (PSSOF ¶ 108; Carden Decl., Ex. F.) However, Defendant avers – and Plaintiff does not dispute – that Ms. Bond was not aware of the arrest when she promoted him. (DSOF ¶ 80; Bond Decl. ¶ 66.) Notably, Plaintiff does not discuss Mr. Guadagno or Ms. Marcinko at all, let alone Mr. Guadagno's arrest, in his Response and thus fails to expound on its relevance to this matter.

1  relevant. (PSSOF ¶ 96.) Finally, Mr. Mills admitted at his deposition that he did not know
2  what Ms. Cruz intended in her email. (DSOF ¶ 91, Ex. 2: 121:23-122:1; 126:12-21.)
3  Plaintiff points to EEOC's interview summary where Ms. Bond stated that the email
4  "caused problems" but fails to elaborate on its significance. (PSSOF ¶ 103.) Without more,
5  concluding that Ms. Cruz's email indicates that TFL had race-based hiring criteria that
6  informed Ms. Bond's decision to not promote Mr. Mills to Store Manager would be purely
7  speculative.

Plaintiff next contends that in or around 2013, a TFL employee informed him that Ms. Bond wanted Plaintiff to cut his hair. Defendant denies that this interaction took place and that Ms. Bond ever discussed Mr. Mills's hair with anyone at TFL. Mr. Mills previously could not name the specific employee at his deposition but now remembers that it was Chris Brown (DSSOF ¶ 86; PSSOF ¶ 86; Mills Decl. ¶ 30.) Viewing the evidence most favorably to Plaintiff, the Court finds that Ms. Bond wanted Plaintiff to cut his hair. However, this finding is insufficient to create a material fact on the issue of pretext. Mr. Mills never spoke to Ms. Bond about his hair. He also did not cut his hair but still was promoted to MIT, Acting Manager, and MIW. (DSSOF ¶ 88.) Mr. Mills's only evidence that the request was based on his race consists of his "prior life experience" and a White Store Manager who also had long hair. While prior life experiences may inform one's understanding of events, Mr. Mills fails to provide any additional details of these prior life experiences. (DSSOF ¶ 93.) Regarding the White Store Manager, Mr. Mills only knows that he did not cut his hair but does not know whether or not he was asked to cut his hair. (DSSOF ¶ 87.) Because of the lack of evidence that the request was racially motivated and the dearth of evidence that it hindered his employment opportunities, the request is insufficient to create an issue of material fact regarding pretext.

Finally, Plaintiff spends a significant portion of his Response providing excerpts from caselaw describing Plaintiff's low burden on summary judgment in Title VII cases. However, Plaintiff fails to point the Court to case law analogous to the facts of this case. Instead, he cites to cases where there was substantially more evidence of pretext than there

is here. In *McGinest v. GTE Serv. Corp.*, which the Ninth Circuit characterized as a "close case," the defendant justified its failure to promote plaintiff due to a hiring freeze but did not produce any evidence that that such a policy was in place. 360 F.3d 1103, 1123 (9th Cir. 2004). The plaintiff in *McGinest* also produced substantial evidence of racial harassment, including racist insults, graffiti, and the defendant's failure to take any remedial action. *Id.* at 1119-21, 23. And in *Chuang*, which Plaintiff cites for its proclamation that "the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment," the plaintiff produced a combination of indirect and "significant" direct evidence of racial discrimination. 225 F.3d at 1124, 1127-29. Finally, in *Bergene v. Salt River Project Agr. Imp. And Power Dist.*, 272 F.3d 1136 (9th Cir. 2001), the Ninth Circuit found sufficient evidence of pretext where defendant changed the selection criteria in multiple ways to benefit candidates other than plaintiff, co-workers referred to plaintiff as "Mommy," and there were no other women supervisors. While most analogous to the instant case, *Bergene* still is inapposite. The selection criteria changing is more probative of discrimination than the use of subjective criteria,[5] co-workers referring to plaintiff as "Mommy" creates a strong inference of discrimination, and unlike the defendant in *Bergene*, Ms. Bond hired multiple non-White Store Managers.

### B.     Plaintiff's Title VII Disparate Impact Claim

To survive summary judgment on a disparate impact claim plaintiff must provide direct or circumstantial evidence showing "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Stout v. Potter,* 276 F.3d 1118, 1121 (9th Cir. 2002). To establish a prima facie case of disparate impact, a plaintiff must: (1) identify the specific practices or policies being challenged; (2) show disparate impact;

---

[5] Plaintiff points to TFL's promotions policy, which provides that TFL's "goal is to reward excellent performance…" and that "[w]henever possible, [TFL] has promoted from within its own ranks" as evidence that Ms. Bond's hiring of external candidates was contrary to TFL's preference for hiring internal candidates. This differs greatly from *Bergene*, where defendant made multiple changes to the specific job posting to plaintiff's detriment. *Bergene*, 272 F.3d at 1143.

and (3) prove causation. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990). Causation is shown if the plaintiff offers "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of [a particular group] because of their membership in a protected group." *Id.* (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 2777 (1988)).

Plaintiff contends that the fast-track program has a disparate impact on non-White candidates because Ms. Bond only hired 6 White Store Managers through the program. Defendant argues that Plaintiff is barred from asserting this theory because his Complaint did not specifically allege that the fast-track program was the "practice" causing the disparate impact. Defendant is correct that the "Disparate Impact' section of Plaintiff's Complaint merely stated, "As more fully described above, Defendant employed the practice and policy of appointing only white individuals to Store Manager positions during Mr. Mills' employment." (Complaint ¶ 36.) However, this ignores that Plaintiff discusses the "fast-tracking" program in his general allegations. (Compl. ¶ 14.)

Defendant cites *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) and *Pickern v. Pier 1 Imports (U.S.) Inc.*, 457 F.3d 963, 965 (9th Cir. 2006) in support but both are distinguishable. In *Coleman*, the Ninth Circuit held that plaintiff could not assert a Disparate Impact claim at Summary Judgment where he had only alleged Disparate Treatment in his Complaint. 232 F.3d at 1292. Here, Plaintiff clearly alleged a claim for Disparate Impact. And in *Pickern*, Plaintiff filed an Americans with Disabilities Act claim alleging that defendant failed to remove architectural barriers but did not identify the actual barriers until her response to defendant's motion for summary judgment. 457 F.3d at 965, 969 ("the complaint gave the Appellees no notice of the specific factual allegations presented for the first time in [appellant's] opposition to summary judgment."). Because Plaintiff identified the fast-track program in his Complaint, *Pickern* is inapposite.

The Court, nonetheless, will grant Defendant's Motion for Summary Judgment because Plaintiff cannot prove causation. Plaintiff's argument that the fast-track program has a disparate impact on non-White candidates ignores the uncontroverted evidence that

Ms. Bond hired multiple non-white candidates for Store Manager positions outside of the fast-track program. Moreover, because the fast-track program was not specific to Ms. Bond, the Court credits evidence that TFL hired multiple other Black candidates as Store Managers. Therefore, while Plaintiff's evidence establishes that Ms. Bond only hired White candidates through the fast-track program, it does not establish that the policy had an adverse effect on TFL or even Ms. Bond's hiring of non-White candidates as a whole.

Plaintiff cites to no case law showing that the Court only should look at the race of who was hired through a specific program rather than who was hired overall when determining causation. Rather, a plaintiff must produce "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of [a particular group] because of their membership in a protected group." *Rose*, 902 F.2d at 1424 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 (1988)) Without such precedent, Plaintiff's statistical data is insufficient to defeat summary judgment, particularly where, as it is here, the sample size is insignificant. *Stout*, 276 F.3d at 1122 (although statistical data alone may be adequate to prove causation, the statistical disparities must be sufficiently substantial that they raise an inference of causation). Here, Plaintiff does not allege, nor does the evidence show, that hiring only white candidates through the fast-track program resulted in an overall statistical disparity of non-White Store Managers. Therefore, the Court will grant Defendant's Motion for Summary Judgment on Plaintiff's Disparate Impact claim.

**IT IS THEREFORE ORDERED** granting Defendant The Finish Line's Motion for Summary Judgment (Doc. 43). The Clerk of Court shall enter judgment accordingly and close this matter.

Dated this 12th day of August, 2021.

Honorable John J. Tuchi
United States District Judge